BARKER *against* THE PHOENIX INSURANCE COMPANY.

BARKER
v.
PHOENIX
INS. Co.

THIS was an action on a policy of insurance on goods, laden on board " the *American* ship called the *Rodman*, at and from *St. Petersburgh* to *New-York.*" The policy was dated the 31st *October*, 1807, and 20,000 dollars subscribed, at a premium of three *per cent.*

The cause was tried at the last *June* sittings, in *New-York*, before Mr. Justice *Thompson.*

The ship sailed from *St. Petersburgh*, on the 6th *October*, 1807, with a full cargo of iron and hemp ; and in the night of the same day, struck on a rock at the north end of *Hochland*. After considerable exertions, with assistance from shore, the ship was got off the next day, and came to anchor, but made a great deal of water; and the wind continuing to blow hard, she dragged her anchors, and, to get clear of the island of *Hochland*, the master was obliged to set sail and cut the cables. On the 10th *October*, the ship again struck on *Cable Ground*, but beat over and continued sail, the wind blowing hard and the

*The clause in the New-York policies of insurance, that the loss is to be paid in 30 days after proof of interest and loss, is merely to furnish reasonable information to the insurer, and is liberally construed, to require only the best evidence of the fact in the possession of the party at the time On the 5th October, the insured made an abandonment in writing, accompanied with a copy of a letter from the master of the ship to the correspondents of the insured, stating the fact and causes of loss, and on*

the 21st of *October*, the insured delivered to the insurers all the requisite documents containing full proof of interest and loss, and renewed his claim for a total loss ; and at the expiration of 30 days thereafter brought his action. It was held, that the act of abandonment on the 5th *October* was valid, and sufficient to fix the technical total loss, and that the preliminary proofs were sufficient to entitle the insured to bring his action, admitting that they were not sufficient on the 5th *October*, for the whole might be considered as one entire transaction.

Where a ship, on a voyage from *St. Petersburgh* to *New-York* met with an accident, by the peril of the sea, in consequence of which she put into *Copenhagen*, from necessity, in order to refit, it was held that the wages and provisions of the crew, the expenses of unloading, repairing, reloading, storage, &c. from the time of the accident, until the ship was again ready to sail, were general average ; a proportion of which was to be paid by the insurer on the *cargo*, in addition to a total loss, the cargo having been forcibly detained by order of the *Danish* government.

Where the insurance was expressed to be on the " good *American* ship called the *Rodman*," it was held to be a warranty that the ship was *American ;* and proof that she was owned by an *American* citizen, and had all the papers for an *American* vessel, except a *register*, having sailed with a *sea letter* only, was held to besufficient evidence of a compliance with the warranty.

ALBANY,
August, 1811.

BARKER
v.
PHOENIX
INS. Co.

vessel labouring much. The weather being very tempest-
uous, and the ship continuing leaky, the master was com-
pelled to go into the roads of *Copenhagen;* as the crew re-
fused to proceed with the ship, unless she was repaired.

The ship was regularly surveyed at *Copenhagen,* and it
became necessary to land the cargo, which was also sur-
veyed. After the necessary repairs were completed, the
cargo reloaded, (except three bundles of hemp, which
were damaged,) and the ship ready for sea, the master,
on the 25th *March,* 1808, applied to the *American* consul,
to obtain a clearance, and permission to proceed to *New-
York,* and the consul informed the master, that there was
an embargo at *Copenhagen* on all merchant vessels, so that
it was impossible to obtain a clearance. When the ship
first arrived at *Copenhagen,* there was no embargo, nor
did the master know of it, until after she was reladen,
and the information given by the *American* consul. The
master had an interview with the king of *Denmark,* in
order to obtain a clearance, which was granted, and his
majesty, in consideration that the ship was forced into
*Copenhagen* in distress, granted permission that she might
sail, in ballast, with a sufficient store of provisions for the
voyage; but refused to permit her to sail with her cargo,
which he said must be unladen, and observed, that the
embargo must be continued during the war with *England.*
Under these circumstances, to save the expenses of the
vessel and cargo, during the uncertain continuance of
the embargo, the master, with the advice of the *Ameri-
can* consul, relanded the cargo, and sailed from *Copenha-
gen,* in ballast, on the 29th *May,* 1808, bound for *New-
York.* By reason of unfavourable winds and con-
trary currents, she was forced to anchor in the sound, at
*Elsenburgh,* where she remained six days. The mate and
three of the crew becoming sick and unable to do duty,
the master deemed it prudent to put into *Gottenburgh,*
on the 6th *June,* where the mate died, and three of the

crew were left in the hospital. Having obtained another mate, the master took a freight from *Gottenburgh* for *St. Petersburgh*, where he arrived the 24th *July*, 1808.

The plaintiff proved, that on the 5th *October*, 1808, he addressed the following letter of abandonment to the defendants, which was delivered to them.  " Gentlemen, having received information of the detention of the *Rodman's* cargo at *Copenhagen*, I hereby abandon to you such proportion of it as is insured at your office, by a policy dated 31st *October*, 1807, and shall expect payment for a total loss, in 30 days from the date hereof."  " N. B. You have, herewith, a copy of a letter from Capt. *Corliss* to *Thomas Mullett & Co.* containing all the information I have received on the subject of the *Rodman's* cargo." The letter of the captain was dated at *Gottenburgh*, the 11th *July*, 1808, and referred to a former letter to *T. Mullett & Co.* of *London*, informing them that the cargo of the *Rodman* had been detained at *Copenhagen*, by order of the *Danish* government, and was left in the hands of Messrs. *Ryburg & Co.* for the account of the plaintiff. This letter also detailed the facts above stated, relative to what took place at *Copenhagen*, and specified the articles and amount left at *Copenhagen*.

On the 21st *October*, 1808, the plaintiff sent to the defendants a bundle of papers, as proof of interest and loss, when he again claimed payment for a total loss; and this suit was not commenced until 30 days after. Among the papers delivered to the defendants, were a survey on the vessel at *Copenhagen*, a survey of the cargo, a *protest* of the captain and crew, made at *Copenhagen*, dated the 23d *October*, 1808, and a certificate of the *American* consul, dated the 27th *May*, 1808, an account of *Smith & Co.* the shippers of the cargo at *St. Petersburgh*, by which it appeared that it cost 29,000 dollars; and an invoice and bill of lading, showing that the property belonged to the plaintiff.

The counsel for the defendants objected to the preliminary proof as insufficient, but the objection was overruled.

The plaintiff's counsel then read in evidence the deposition of the master, which detailed the facts relative to the ship and cargo above stated, and the accounts referred to by him, in which were the expenses of the vessel, including repairs, captain's and seamen's wages, provisions, and all other expenses in relation to vessel and cargo, from the time she met with the accident which obliged her to go into *Copenhagen*, until she sailed from thence, and claimed an average contribution from the defendants for all those charges, except such as were properly chargeable as a particular average on the vessel. The counsel for the defendants objected to their being charged with any of those expenses, on the ground that the vessel never pursued her voyage to *New-York ;* and they particularly objected to the liability of the defendants for any of the expenses incurred at *Copenhagen*, after the 25th *March*, 1808, when the cargo was reladen, and the vessel ready to sail on her voyage, and would have sailed, had it not been for the embargo. And the judge ruled that the defendants were liable to contribute for the expenses incurred previous to the 25th *March*, 1808, but not for those subsequent to that date.

A witness for the plaintiff testified, that the ship was the property of the plaintiff, who was a native *American* citizen, and that she was worth 16,000 dollars, but being only a *sea-letter* vessel, she would be worth 1,000 dollars less. That she sailed from *New-York* for *St. Petersburgh* properly documented, as a *sea-letter* vessel. The counsel for the defendants objected to any parol proof of the documents, and the objection was sustained by the judge. Another witness testified that the ship was *English built*, and not worth more than 12,000 dollars.

The counsel for the defendants moved for a nonsuit, on the ground that the vessel was warranted by the po-

licy, to be an *American* vessel, and the plaintiff had pro-
duced no proof of her being such; but on the contrary,
it appeared from the testimony in the cause, that she
was only a *sea-letter* vessel, without an *American* regis-
ter.

The judge overruled the motion, and directed the jury
to find for a total loss; and for a portion of the average
expenses, which had accrued previous to the 25th *March*,
1808; and the jury found a verdict accordingly, for
26,382 dollars and 97 cents.

A motion was made to set aside the verdict, and for
a new trial.

*Harris* and *Van Vechten*, for the defendants. 1. The
preliminary proofs were not sufficient to entitle the plain-
tiff to recover.

The doctrine of abandonment does not necessarily
arise out of the contract of insurance. It has been in-
troduced for the convenience of the insured. It is an
indulgence which, the courts in *England* say, has been
carried far enough, and ought not to be extended.

When an abandonment is made, the insured is bound
to exhibit to the insurers satisfactory evidence of a total
loss. The bare allegation of the insured is not sufficient.
Though *technical* proof may not be necessary, yet there
must be *proof* of interest and loss, and this under oath.
The *protest* of the captain is always mentioned among
the requisite proofs.* Here, the only evidence of loss
was the *copy* of a letter from the captain to *T. Mullett
& Co.*

* 1 *Johns. Rep.*
181. *Condy's*
*Marsh.* 601. a.
note. 716. note.
2 *Johns. Rep.*
136. 1 *Caines,*
49. 1 *Johns. Cas.*
313. 4 *Johns.*
*Rep.* 132.

[KENT, Ch. J. In *Craig* v. *The United Insurance
Company*, the preliminary proof consisted only of three
letters.]

The letters in that case were originals; but here is a

copy only of a letter, which refers to a former letter of the master, which is not produced.

It may be said, on the other side, that the documents delivered to the defendants on the 21st of *October*, supplied all deficiency of the proofs on the 5th of *October*, when the abandonment was made. But the abandonment is definitive at the time it is made.* If not good then, it is void. Subsequent proofs cannot revive and make effectual a former void abandonment.

2. The wages and provisions, and expenses of unloading and storage of the cargo, during the detention at *Copenhagen*, ought not to have been brought into general average.

To support a claim of contribution for general average, the loss or damage must have been voluntarily incurred, for the general safety of the ship and cargo; and it must appear that the ship and residue of the cargo have been, in fact, saved.†

These expenses fall exclusively on the freight; and are not to be brought into general average. *Abbott*‡ seems to consider the question as unsettled in *England*, but in *M‘Bride* v. *The Marine Insurance Company*,§ a case analogous to the present, this court decided that the wages of the crew, during the detention of a ship by an embargo, are not general average, but fall exclusively on the ship.

The principle of the decision in *Penny & Scribner* v. *The New-York Insurance Company*,¶ overrules the cases of *Walden* v. *Le Roy*,** and *Henshaw* v. *The Marine Insurance Company*.††

[KENT, Ch. J. The case of *Sharp* v. *Gladstone*, (7 *East*, 24.) confirms the decision in the case of *Walden* v. *Le Roy*, that *wages* and *provisions* to the crew, during a forcible detention in a foreign port, are general average.] ·

* 1 *Johns. Rep.* 281. 1 *Johns. Cas.* 311.

† *Marshall on Ins.* b. 1. c. 12. s. 7. *Ff.* lib. 14. *Lex Rhod. de jactu.*
‡ *Abbott on Ship.* part III. c. 8. s. 8, 9.
§ 7 *Johns. Rep.* 431. *Beawes' Lex Merc.* 148. *Park*, 172. *Magens*, 56. 64. 98. 240. *Ord. Louis* XIV. tit. *Contrib.* art. 15, 16.

¶ 3 *Caines*, 155.
** 2 *Caines*, 263.
†† 2 *Caines*, 274.

Though the owner of the cargo may be liable to contribute to these expenses, as general average, does it follow that the insurer is obliged to contribute? No *freight* has been earned in this case. The goods have never arrived at the port of destination. The insurers on the cargo can derive no possible benefit from these expenses. Putting the embargo out of the case, suppose it had been necessary to hire another ship, to bring on the cargo to *New-York*, would the cargo or the defendants have been liable for the hire of the new ship? If not, neither can they be liable for the expenses of the old ship.

Again, the plaintiff under the declaration in this action, cannot recover for a general average. The liability of an insurer for general average, does not arise out of the contract of insurance. The defendants are not liable, if at all, *qua* insurers, but as *owners*, in consequence of the abandonment. The plaintiff must, therefore, sue on the implied contract to contribute, as owners.

3. The ship was warranted *American*, and the plaintiff did not prove a compliance with the *warranty*. The words " good *American* ship," amount to a warranty that she is *American*.\* The plaintiff was bound to prove the fact, by documentary evidence.

All the evidence produced was, that she was a *sea-letter* vessel, owned by the plaintiff. The *warranty* implies, that she is a registered vessel of the *United States;* and to be registered, she must be *American* built. In *Baring* v. *Claggett*,† Lord *Alvanley* says, to entitle a ship to become an *American* ship, within the meaning of the treaty between *France* and the *United States*, or to the privilege of carrying the *American* flag, as a safe conduct among belligerents, she must have a register.

Sea letters were first issued in 1793, by the custom-houses, pursuant to an order of the president of the *United States*. In 1796, by an act of congress, (4th cong. sess. 1. c. 45.) it was made the duty of the secre-

ALBANY,
August, 1811.

BARKER
v
PHOENIX
INS. Co.

\* 1 *Johns. Cas.* 341. 2 *Johns. Cas.* 168. 3 *Bos. & Pull.* 201.499.

† 3 *Bos. & Pull.* 201.

tary of state to prepare a form of a *passport* for ships and vessels of the *United States,* and every ship and vessel going to any foreign country were required to take these *passports.* In 1803, an act was passed, (7th cong. sess. 1. c. 69.) directing these *passports* to be granted to unregistered ships, owned by citizens of the *United States,* or ships sailing with a *sea-letter.* According to this act, a *sea-letter* and a *passport* are distinct papers. It appears that though a *sea-letter* formerly meant a passport, it now means only a *certificate of ownership,*[*] a document that has no relation to the national character of the vessel.

* *Sleght* v. *Rhinelander,* 2 *Johns. Rep.* 531. 547.

This ship, then, being a mere *sea-letter* vessel, was not documented according to the treaties between the *United States* and foreign powers; and did not, therefore, possess the national character required by those treaties to entitle her to protection under them.[†] The want of the *passport,* or any of the documents required by those treaties, would expose the vessel to be captured and condemned. To comply with the warranty of neutrality, the insured must show not only that the vessel is owned by a neutral, but that she was furnished with all the documents required by the law of nations or public treaties, to establish her neutral character.[‡] Mere *ownership* may be proved by parol; but the national character of a vessel can only be shown by written documents.

† Treaty with *Holland,* 1782, art. 10. 25. Treaty with *Spain,* 1795, art. 17. Treaty with *Tripoli,* 1796, art. 4. with *Tunis,* 1799, art. 4. with *France,* 1800, art. 4.

‡ *Park,* 469 7 *Term Rep.* 631. 705. 1 *Caines,* 549. 2 *Johns. Rep.* 157. 2 *Esp. Cas.* 615.

*Henry,* contra. 1. The reason of the clause, inserted in our policies, requiring proof of loss and interest before commencing an action, was to enable the insurers to decide as to accepting the abandonment, or not. Technical proof, it is conceded, is not requisite. Reasonable and satisfactory evidence must, then, be sufficient; and the letters exhibited contained that evidence. Again, the formal abandonment was made on the 5th of *Octo-*

*ber*, but on the 21st of *October*, all the documents and papers were exhibited, accompanied with a renewal of the claim for a total loss; and the suit was not commenced until 30 days after. A *protest* by a *sailor*, a *gazette* account, a *notice* at *Lloyd's* coffee-house, have been deemed sufficient evidence of loss, on which to ground an abandonment.

2. None of the wages or expenses subsequent to the 25th of *March*, 1808, were allowed by the jury.

The principle on which average contributions are allowed in such cases is, that the expenses have been incurred for the general benefit; it being just and reasonable, that where it is for the benefit of all, the expense should be divided among all. The subsequent loss by the embargo, which prevented the arrival of the goods, does not vary the case. For suppose the agent of the insurers had been on the spot, and had paid his proportion of the general average, could the defendants have, afterwards, recovered back the money paid, on the ground of the subsequent event?

The objection that the insurers are not liable, *qua* insurers, is, at best, technical, and deserving of no weight, when the merits are with the plaintiff.

3. It was impossible for the plaintiff to produce the *sea-letter*, in this case, as the vessel has never returned to the *United States*. The case admits the fact that she had a sea-letter, and that she was properly documented as a *sea-letter* vessel; and the defendants must be bound by this admission.

The objection, then, is this, that she was not an *American* vessel, within the meaning of the warranty, because she was not *registered*.

The words " good *American* vessel," do not necessarily imply that she has a *register*, but only that she is *American* property. An *American built* ship, owned by native citizens, may lose her register, or the privilege of

a registered vessel, if she does not comply with the requisites of the register act; yet she does not cease to be an American vessel. If she is not an American vessel, what is she ? Is she French, English, or Spanish ?

By the act of congress, 14th April, 1792, a sea-letter or passport is required, and they are regarded as synonymous. Marshall* enumerates the documents requisite for neutral ships, and the first he calls a passport, sea-brief, or sea-letter. Though a distinction may have existed, in some subsequent acts of congress, between a passport or sea-letter, yet by a late act of congress, passed the 26th of March, 1810, all such distinction is done away, and they are considered as the same. An American vessel may be registered, and, as such, entitled to certain privileges, or she may be unregistered, and subject to pay higher duties, and yet remain American property. When this policy was subscribed, the defendants must have known the distinction between registered and unregistered ships, and the nature of the different documents. If they intended that the ship should have a register, they should have required a warranty to that effect, otherwise they must be understood as intending only that she was American property.

The decision in the case of Baring v. Claggett, may be good law in England, but is not law here. But Lord Alvanley would have decided very differently, had he been acquainted with the subsequent acts of congress, and the nature of the distinction between registered and unregistered American vessels, which are equally entitled to the protection of the flag of the United States. This vessel then sailing with a sea-letter or passport, had a sufficient document to entitle her to be respected as a neutral vessel sailing under the protection of the United States.

But the want of any of the proper documents is not conclusive evidence against a ship's neutrality.† And it is expressly provided, by the 17th article of the treaty

*On Ins. 406.

†Marsh. 408.

with *France*, of *September*, 1800, that if any ship shall not be furnished with such passport or certificate, as is required by the 4th article, yet if, on examination, it shall appear, from other documents or proofs, that the ship belongs to the citizens of the neutral party, she shall not be confiscated, but shall be released and permitted to proceed on her voyage.

KENT, Ch. J. delivered the opinion of the court. 1. The first objection to the plaintiff's right of recovery is, that the preliminary proofs were insufficient. The plaintiff duly and formally abandoned in writing, on the 5th of *October*, and communicated with the letter of abandonment, a copy of the letter from Captain *Corliss*, of the 11th of *July* preceding, which contained all the information that he had, at that time, received. The letter of the captain stated, that the cargo insured had been detained at *Copenhagen* by an embargo, and that he had been obliged to leave it behind. The plaintiff, upon receiving this advice of a total loss, elected to abandon, and there is no doubt but that the fact of the detention of the cargo justified the measure. It was sufficient for the plaintiff to have stated, as he unequivocally did in his letter, his determination and offer to abandon, together with notice of the particular loss upon which it was grounded. This was all that the law required, to give validity to the act. (*Marshall*, tit. *Abandonment*, s. 3. *Thelluson* v. *Fletcher*, 1 *Esp. Rep.* 73. *Emerigon*, tom. 2. 189.) The requisite documents, and proofs of interest and loss, may be communicated, says *Emerigon*, (p. 192.) at any time after the abandonment. The act of abandonment, under the general law of insurance, and the furnishing the preliminary proofs, under the special stipulation in the policy, are distinct acts, and must not be confounded. The clause in the policy, that the loss is to be paid, thirty days after proof thereof, gave rise to what is termed, in our books, *the preliminary proofs;*

and as its object was only to furnish reasonable informa-- tion to the insurer, so that he might be able to form some estimate of his rights and duties, before he was obliged to pay, it has always been liberally expounded, and is construed to require only the best evidence of the fact that the party possesses at the time. (*Talcot* v. *Marine Insurance Company*, 2 *Johns. Rep.* 130. *Haff* v. *The Same*, 4 *Johns. Rep.* 132.) But, in this case, more ample proof was furnished on the 21st of *October*, which was admitted by the counsel to have been above thirty days before the commencement of the suit. The papers which were then presented afforded sufficient proof of interest and loss, and the claim for a total loss was renewed. This claim was founded upon one plain, specific fact of loss, appearing upon all the papers, and never varied; and if it were necessary to connect the several communications, they might well be considered as one entire transaction begun on the 5th, and consummated on the 21st of *October*. But if we take the acts separately, there was a regular abandonment on the 5th of *October*, which was sufficient to satisfy the law, and to fix the technical total loss; and admitting the proof to have been then insufficient to meet the special clause in the policy, it was fully supplied on the 21st, and gave the plaintiff his right of action at the expiration of the thirty days.

2. The next objection is, that the defendants are charged in the verdict with the cargo's proportion of a general average arising from unloading and storage of the cargo, and the wages and provisions of the crew, during the time that the vessel was necessarily detained at *Copenhagen* to refit, and prior to the intervention of the embargo. That these expenses, incurred in a case of such necessity, form a general average, was settled in the case of *Walden* v. *Le Roy*, (2 *Caines's Cas.* 263.) and that the ship was driven into *Copenhagen* by the perils of the sea, is conclusively shown. These are expenses which the insurer is to pay, in addition to a total

6

loss, and so it was lately declared by this court in *Jumel & Desobry* v. *The Marine Insurance Company*, (7 *Johns. Rep.* 412.) There is then no real foundation, nor even a plausible pretence, for any objection to this part of the recovery.

3. The last objection is, that the plaintiff had not shown a compliance with his warranty. The insurance was upon " The good *American* ship, called the *Rodman*." These words amount to a warranty that the ship was *American*, according to the settled construction of the phrase, both in this and in the *English* courts. (1 *Johns. Cas.* 341. 2 *Johns. Cas.* 168. 3 *Bos. & Pull.* 201. 506. 510. 514. 531. 6 *East's Rep.* 382.) A warranty that the property is *American*, undoubtedly means that it is not only so in fact, but that it shall be clothed with the requisite evidence of its *American* character, for the purpose of protection, and in reference to the law of nations, under the sanction of which the voyage in question was to be conducted. (1 *Johns. Cas.* 365. 2 *Johns. Cas.* 148.) It was proved that the ship was owned by the plaintiff, and that he was an *American* citizen; and from the case we are to conclude, that the ship had all the papers requisite for an *American* vessel, except an *American* register. The case is somewhat equivocal upon that point, but this we think to be the better construction of it. If she had not the documents required by our treaties, it ought to have been made a distinct, substantive ground of objection, at the trial. The case states, that " the defendants' counsel moved for a nonsuit, on the ground that the vessel was warranted by the policy to be an *American* vessel, and that the plaintiff had produced no proof of her being such; but that, on the contrary, it appeared, from the testimony in the cause, that she was only a sea-letter vessel, without an *American* register." This was an admission that she was a *sea-letter* vessel, though the competent proof of that

fact is not disclosed in the case, and the defendants evidently placed their motion for a nonsuit on the *single* ground of the want of a *register*. If any thing was wanted to show a compliance with the warranty, except the register, it ought to have been expressly so stated. The presumption must be, after verdict, and upon this case, that every objection was supplied. We are then reduced to this single point, was the want of a register a breach of the warranty? At the time the policy was underwritten, there were two kinds of *American* vessels, the one registered, and the other unregistered and carrying a sea-letter, or an official certificate of ownership, and both kinds were recognised by law, as *American* vessels, though the former was entitled to higher privileges under the laws of congress. (*Laws U. S.* vol. 6. 72.) But, in reference to the law of nations, and to security upon the high seas, both species of vessels were equally entitled to protection as *American* property. There was no use in requiring a register for any object within the purview of the warranty. The want of it did not enhance the risk. " It is a known and established rule," says Sir *William Scott*, in the case of the *Vigilantia*, (1 *Rob.* 113.) " that if a vessel is navigating under the *pass* of a foreign country, she is considered as bearing the national character of that nation under whose pass she sails; she makes a part of its navigation, and is in every respect liable to be considered as a vessel of that country." What was said by Lord *Alvanley* in *Baring* v. *Claggett*, (3 *Bos. & Pull.* 201.) is not applicable, nor does it affect this doctrine. He considered that the warranty of a ship to be *American* required an *American* register, under our navigation act and the *French* treaty, and that the privilege of carrying the *American* flag, as a safe conduct among belligerent powers, was to be denied to all ships not sailing under a compliance with that act. The act he referred to was passed in 1792, (*Laws U. S.*

vol. 2, p. 131.) and declared that none but registered vessels should be deemed vessels of the *United States* entitled to the benefits and privileges appertaining to such vessels. He was not then apprized of the distinction between registered and unregistered vessels, and of the legislative recognition of the latter as *American* vessels, entitled to privileges in port, as such, under the act of 1802. The act of 1792, to which he referred, seems, by its terms, to have left unregistered vessels as alien vessels, and without the protection of the *United States.* Whether that was, or was not, the condition of such vessels at that time, is not now a material inquiry, since the vessel in question, at the time of the warranty, was not only *American* property in fact, but entitled, by her *sea-letter*, under our law, and under the law of nations, to the immunities of the *American* flag. This was equivalent to what was termed by Sir *William Scott* a national pass, and so it was considered in the court of errors, in the case of *Sleght* v. *Hartshorne.* (2 *Johns. Rep.* 531.)

The court are accordingly of opinion, that the motion, on the part of the defendants, be denied.

Motion denied.