By the Court. Sandford, J.
The defendants’ first exception to the ruling of the judge at the trial, was on the admission of the preliminary proofs. It is objected that they did not furnish sufficient proof of the loss to authorize a claim for payment, because the affidavit presented was not made by the owners of the vessel, it did not aver any inquiry or any diligence to ascertain her actual state, it was not the best evidence the nature of the case admitted of, and it did not state facts, which, if proved at the trial, would have carried the cause to the jury on the question of actual loss.
On this subject, it is to be observed, that the '•'■proof of loss” required by the policy preliminary to the obligation to pay, is not legal proof j such as would be competent to carry the cause to the jury on the question at issue. (Talcot v. Marine Insurance Co., 2 John. R. 130.) It was said by Kent, Ch. J., delivering the opinion of the court in Barker v. Phoenix Insurance Co., 8 John. 307, that the object of this clause in the policy, was only to furnish reasonable information to the "insurer, so that he might be able to form some estimate of his rights and duties, before he was obliged to pay; it has always been liberally expounded, and is construed to require only the best evidence of the fact that the party possesses at the time. This opinion was reiterated by Thompson, Ch. J., delivering the judgment of the court, in Lawrence v. The Ocean Insurance Co., 11 John. 242; and it is the well established law in this State. (See Pacific Insurance Co. v. Catlett, 4 Wend. 83.) The protest in one case, and copies of the letters communicating intelligence of the disaster in others, have been held sufficient.
Here, the managing agent, in whose name alone the policy was effected, made the affidavit. The facts stated, and the lapse *42 of time, were abundant to give the underwriters the requisite information to enable them to estimate what were their rights and then duty under the policy. If all the owners had joined in making the affidavit, it would not have communicated anything more to the insurers. The circumstances did not call for any particular exercise of diligence. The vessel had been due for fifteen months, and had not been heard of in twenty months by the managing agent. The nature of the case did not reasonably admit of anything more.
A further reason requires that the clause should be liberally expounded in this instance. Eo objection to the sufficiency of the preliminary proof was made by the defendants, when it was presented. All of those now raised, if they were well founded, are of such a nature that they might have been obviated if they had then been made known; and fairness to the assured, demands that if then overlooked or withheld, they should now be deemed waived.
The two other objections to the preliminary proofs, which appear in the case, were not urged on the argument. The suggestion made in regard to the case already examined is applicable to both of these. As to the one that the interest of the owners of the cargo was not stated, we will add, this was a valued policy on the vessel and outfits, insured by Child as agent, the loss to be paid to him, and it was claimed by him. This was clearly sufficient, as payment to him would have discharged the obligation.
The remaining ground, that the contents of the cargo did not appear, is wholly unfounded. The ship was a whaling vessel, which (the affidavit stated) had set out on her homeward .voyage full / the subject matter insured as outfits, having been converted into a full cargo of oil and bone, or “ takings,” as it is expressed in the policy. If these objections were intended to point at the extent of the interest of the assured, they would be equally untenable; a substantial interest appearing, and the policy being valued. (Atlantic Insurance Co. v. Lunar, 1 Sand. Ch. R. 97; 2 Phill. on Ins. 743.)
2. The newspaper testimony, offered to show that the Jane was at the Sandwich Islands in March, 1845, was entirely *43 irrelevant in every aspect in which it was urged; the plaintiffs, in their preliminary proofs, having conceded that she was at those islands in October following.
The newspaper article which the defendants proposed to read from “The Pobynesicm,” of Hay 22, 1847, was also properly rejected. The ostensible purpose for which it was offered, so far as it affected the plaintiffs’ knowledge of the loss, was plainly incapable of being effected; for the preliminary proofs were submitted to the defendants on the 20th of July, 1847, at which time it was impossible for the plaintiffs to have seen or heard of the article in the Polynesian. And as to the proposed object, to weaken the presumption of the loss of the vessel, not only would the trifling difference of one month have failed to produce any such effect, when nearly three years had elapsed without any tidings from her, but the circumstances detailed in the newspaper were such as to corroborate very strongly her alleged loss by the perils of the seas.
If these were the only objects sought, the defendants could have attained them by reading that portion of the article which stated the touching of the Jane near Talcahuana; but this was not offered or proposed. The real gist of the article was the statement of facts, showing that the captain was far out of his proper course on his homeward voyage, that he carelessly anchored the Jane where her bottom was injured, and that he put to sea while she was in an unseaworthy condition. These were important facts undoubtedly, if they could have been proved; but no legitimate proof was offered. The newspaper was not competent evidence to prove such facts. It was hearsay testimony, twice removed; and it was the duty of the judge to exclude the article. It is unnecessary for us to consider, whether as to any portion of the article, if offered separately, the newspaper would have been a competent instrument of evidence.
3. The great mass of the testimony at the trial was advanced to show what was a “whalmg voyage,” as understood and practised in commerce, when this policy was effected. The defendants objected to the admission of the testimony offered on this point, so far as it went to show that it was the usage to take *44 sea elephants as well as whales, in the prosecution of such a voyage. They contend, 1. That the expression “whaling voyage ” in this policy means a voyage for apprehending whales only; and the testimony admitted was offered to vary and contradict the plain and distinct terms of the contract between the parties. 2. That this construction of its terms was corroborated by the context of the policy, which spealcs of valuing whale oil, sperm oil, and whale bone,, but nowhere alludes to such an article as elepha/nt oil, which, it is proved, is known by that name, and not as whale oil in commerce.
As to these objections, we say:—1. We are not informed, judicially, what is meant by a “whaling voyage.” It is a term used in trade and commerce, for the meaning of which, like many others, the courts resort to the evidence of experts and those versed in the particular branch of trade. Whether this be* denominated proof of a usage, or evidence given to indicate the subject matter of the policy, and to point out its application; it is unquestionably competent, and was properly received at the trial. Hr. Justice Duer, in his admirable treatise on marine insurance, illustrates very folly this rule of evidence. He says,' in substance, that the law ascribes to the insurer a knowledge, not only of the general usages of commerce, but of the comse usually pursued in each particular voyage or trade that may be' the subject of an insurance; and when words which merchants employ in the prosecution of the trade to which an insurance relates, are introduced into the policy, the insurer must presume that they will be understood by the assured in the sense in which alone he has been accustomed to use them. (1 Duer on Tris. 181, 196, §§ 33, 42, 43.) Parol evidence to prove the existence of the general practice or course in which the trade or voyage has been pursued, is admissible in such cases, when such practice would not be embraced by the terms of the policy in their ordinary interpretation. (Ibid. 195, § 42.) The competency of this species of evidence was affirmed by this court in Hone v. The Mutual Safety Insurance Co., 1 Sand. R. 137, 150. We also refer to 1 Phill. on Ins. 489, and the cases there cited. Among the illustrations of this principle, which are quite analogous to the proof offered in the case at bar, will be found the *45 instances of an “ India voyage,” a “ China voyage,” a “ voyage to Africa,” and a “ fishing voyage.” Evidence of other usages in whaling voyages has been sanctioned; as in Fennings v. Lord Grenville, 1 Taunt. 241, where it was proved to be the custom that he who strikes a whale with a loose harpoon, is entitled to receive half the produce from him who kills it; and in Baxter v. Rodman, 3 Pick. 435, where a usage to mate whaling vessels was proved.
In truth, the proof offered in the case before us, did not go to show a practice beyond the terms of the policy, construed by their ordinary signification. Assuming that a “whaling voyage ” would in common parlance be taken to mean a voyage for the purpose of taking whales only, to the exclusion of other marine animals yielding oil, (the oil being the chief object of such voyages;) yet the other clauses of the policy, (adopting the same key to its construction,) show that something besides whales was intended, or was at least permitted. One clause declares that the policy attaches on oil, bone, and other taldngs, &c., homeward; which being followed by an enumeration of whale oil, sperm oil, and whale bone, with blank valuations, would lead almost irresistibly to the conclusion, that the word “ oil,” m the previous paragraph, related to sperm and whale oil, and that the words “ other takings,” related to some other object which fell within the purview of a whaling voyage. The evidence given to show what such object was, did not, therefore, extend the terms of the policy in any mode of construing it.
4. It was contended that the usage to take sea elejfiiants, which are only taken on land, necessarily involved the overruling of the written contract between the parties in this, that the policy, by giving express permission “ to stop at all ports and places for trade, refreshment, and recruits,” excluded the vessel insimed from touching or staying for any other purpose. It was also urged in a subsequent point, that the detention of the Jane at Ceros island, was a deviation; she having virtually touched and stopped there, and not for either of the purposes for which the express permission was given by the policy.
On this subject, the privilege expressed by these words in the • olicy, was inherent in every whaling voyage, with the excep *46 tion of the right to trade. The judge held at the trial, that the clause did not restrict the vessel from going into hays and along coasts and islands, in the prosecution of the whaling voyage on which she sailed; and the counsel for the defendants did not dispute the accuracy of this ruling. (And see 1 Phill. on Ins., 502, &c.) The judge further held, and so instructed the jury in distinct and pointed terms, that if the Jane went to Ceros island for any object other than the usual purposes of a whaling voyage ; or stayed there for any other purpose; or if the vicinity of the island was not whaling ground : in either event, her voyage and stay there were a deviation, and discharged the defendants. This was sufficiently favorable to the defendants, and we need not further advert to the argument founded on the permission to touch and stay.
5. In the order of their argument, the two next points of the defendants relate to the sufficiency of the proof of the usage or practice to take sea elephants in the course of a whaling voyage. It is contended that the evidence in its support was too feeble to be submitted to the jury; and if it were properly submitted, that their verdict was contrary to the evidence. As to these points we have no hesitation in saying, that the judge would have .erred if he had withheld the question from the jury; and that there is no good ground for our interfering with their verdict on the score that it is against the weight of evidence.
6. The defendants at the trial offered to prove by one of the witnesses, a master of a whaling vessel belonging to Hew Bedford, which had taken sea elephants at and near Ceros island, in Hovember, 1846, that he sailed under a policy for a whaling voyage, and that the policy was subsequently amended, by indorsing an express permission to take sea elephants, for which an additional premium was paid. They also offered to prove, that previous to the date of the policy in suit, it had been the general and uniform usage of assurers at Hew Bedford, when it was intended to employ in taking sea elephants, a vessel insured on a whaling voyage, to insert a liberty to that effect in the policy, for which liberty an additional premium was paid. The judge excluded the testimony so offered.
*47 As to the first offer, it was an act Ínter aUos, neither of whom was present to show under what circumstances, or with what views it was done. The policy was so amended two or three years at least after the policy in suit was .effected, and, in fact, after the time when the loss probably occurred. The testimony did not tend to show how a whaling voyage was actually prosecuted in and prior to 1843, in respect of sea elephanting.
As to the offer of the ¡New Bedford usage, it should be stated on the one hand, it appeared that the port of ¡¡New Bedford was the most extensively engaged in the whale fishery of any in the United States, owning and employing about a third of the entire fleet of whalers; and on the other hand, that very few of the ¡New Bedford whalers were shown to have ever engaged in the pursuit of sea elephants; a great proportion of them seeking the sperm whale, which led them away from the resorts of the sea elephant.
On considering the point, we think the proposed evidence was inadmissible, for two reasons at least; viz.—1. It was a local usage, not extending to New York where the policy in suit was made; nor to Warren, R. I., where the assured resided, and to which port the vessel belonged. 2. It was the usage of the assurers only; and, although from the payment of premium, we might infer the assent of the assured, the limited terms of the offer would leave it in doubt, whether the assent was a ratification or admission of the usage, or was caused by greater caution and a' desire to leave no room for controversy. If it were the well established usage at New Bedford, that a whaling voyage did not include sea elephanting, the underwriters, and the owners and masters of whalers in that port, could have proved it far more satisfactorily than it could possibly be done by the production, without explanation, of the policies executed by and between them. It would then have appeared whether the insurers there refused to pay a loss in cases where" the vessel insured had taken sea elephants, without any permissive clause in the policy.
7. The defendants insisted that the contract of mateship made and executed by the Jane with the ship Eagle, was not authorized by the policy, and discharged the underwriters. It is only *48 because the mating varied the risks insured against, i. e. constituted a deviation, that-it can be claimed to have avoided the policy. Ho complaint was made in regard to the judge’s instruction to the jury as to what in law constituted a deviation, and his charge as to the good faith of a defence on that ground, was warmly eulogized by the defendants’ counsel. But it is claimed that the mateship, as matter of law, was a deviation from the voyage insured, and that the judge ought so to have advised the jury.
To establish a deviation, the fact must appear, that the risks insured against, were increased or varied without necessity or reasonable cause. -This, like other facts, is to be drawn from the evidence. Where the evidence is all on one side; or where the point depends upon the construction of the policy, the judge should undoubtedly determine whether the deviation be proved. Thus, if the policy were on a voyage from Hew York to Liverpool, and it were proved that the vessel, on leaving this port, sailed direct to Madeira, without any necessity or reasonable cause, the judge in an action on the policy would be bound to instruct the jury that there was a deviation. But when, as in this case, the fact whether the risk was increased or altered, depends on a variety of circumstances, peculiar to the pursuit in which the vessel was engaged, and the evidence, to say the least of it, is not decisive to prove the fact; the decision of the question belongs to the jury, and not to the judge. The course pursued at the trial, in Thorndike v. Boardman, 4 Pick. 471, illustrates and sustains our jiosition. In Berman v. Woodbridge, Dougl. 781, 783, 788, Lord Mansfield left it to the jury to say, (on the testimony of the only witness examined,) whether the deviation there in question was wilful or necessary. The defendants’ counsel relied very strongly on the case of Tennant v. Henderson, 1 Dow’s P. C. 324, as establishing that the mating was of itself, in law, a deviation fatal to the policy. That was a suit in the Court of Session in Scotland, on an insurance effected on the ship Imperial and her cargo on a voyage to the coast of Africa and the African Islands, and during her stay and trade there, and from thence back to Liverpool, with liberty to exchange goods with other ships.
*49 Soon after her arrival on the west coast, the Imperial met the George, another ship belonging to the same owners, which had been on the coast two or three months; put on board the George the goods she had then collected in her trading, and received from the George all that remained of the outward cargo and superfluous stores of the latter; the object being,,by means of the exertions of both ships, to despatch the George with a full cargo, before the Imperial began to trade on her own account. This mutual or combined trading was not communicated to the underwriters. The Imperial was captured by a French privateer; and the underwriters, in their defence, contended that the matters stated, established a concealment of a material fact, since the risk was varied and increased by the consequent protracted stay of the ship in the pestilential climate of the west coast of Africa. To rebut this defence, the Lord Ordinary allowed the assured to go into proof, that by the understanding of those engaged in the African trade, liberty to exchange goods with other ships, imported a liberty not only to barter and sell, but to aid another ship in providing her speedily with a homeward cargo, without regard to any proportion between the goods so delivered or received. The proof did not establish the usage to the satisfaction of the judge, who held that the subserviency of the Imperial to the George, prolonged her stay and increased the risk; and he pronounced a decree for the underwriters. On an appeal to the House of Lords it was held that the decree was right, and it was affirmed.
It is to be observed, that in 1809, when the case of Tennant v. Henderson was pending, there was no trial by jury in the court of session, and the court passed upon both the law and the fact. The case is, therefore, no authority in support of the position that the mating of two whaling vessels is of itself a deviation, as matter of law.
In Hartley v. Buggin, 3 Dougl. 39, also an action on an insurance upon a ship in the African trade, it was proved that she had been used as a receiving or factory ship on the coast; and it was left to the jury to say, whether the use thus made of the ship, had for its object the voyage insured. If it had not, there was a deviation, her stay being protracted by the use thus made *50 of her. The lading of the judge in the case at bar, was more favorable than this to the defendants; because it left the jury to find a change of the risk in other modes, as well as by the longer stay of the vessel.
Upon the whole, we are satisfied that no error was committed on the trial, and the- motion for a new trial must be denied.