THE PACIFIC INSURANCE COMPANY *vs.* CATLETT and
KEITH.

Where an insurance was effected by the owners of *five sixths* of a cargo of specie amounting to $90,000 upon their interest in the cargo to the extent of $30,000, and a loss happened, *it was held*, that they were entitled to recover the *whole* sum insured, and not merely five sixths thereof.

An averment in the declaration that a large quantity, to wit, 30,000 Spanish milled dollars, were laden on board the vessel for the contemplated voyage, and that the plaintiffs were " the owners of and interested in the said specie to a large amount, to wit, the amount *of all the money* by the said plaintiffs insured thereon," and that the policy was made on their account and for their sole use and benefit, was *held* to be supported by proof that the assured were the owners of five sixths of the $90,000 shipped on board the vessel, and that there was no variance between the proof and the averment, the averment being not of an entire interest in the whole cargo, but of an interest in the cargo to the amount insured thereon.

A sale of the cargo and an investment of the proceeds in other merchandize by the owner of the remaining *one sixth* of the cargo for the purpose of remittance, he having gone out in the vessel as *supercargo*, a technical loss having happened, and the cargo having been left under his control by the master of the vessel at the port of necessity, does not destroy the right of the other owners who had insured their separate interest in the cargo to abandon the same to the underwriters, if, under the circumstances of the case, it would have been the duty of the master to have made the same investment for the benefit of whom it might concern.

On a policy of insurance entered into *in behalf* or *on account of the owners* of a cargo, no one but the *owners* can sustain an action upon it; where the policy is entered into *for whom it may concern*, the action may be sustained by any one, although he has but a special interest in the cargo as by lien, *respondentia* or otherwise. In either case, however, it must appear that the policy was made in behalf of the person claiming to recover.

One whose interest was *not intended* to be insured cannot claim the benefit of an insurance effected by others, although by the *terms* of the policy, his interest would seem to be covered.

ERROR from the supreme court. The action in the supreme court was on a policy of insurance, dated the 2d February, 1818, on the cargo of the brig Sphinx, from *Alexandria* in the district of Columbia to *Canton*, and at and from thence back to Alexandria. The insurance was effected by Le Roy, Bayard & Co. in N. Y., in pursuance of a letter of instructions from *Charles I. Catlett* of Alexandria, of the 29th January, 1818, requesting them to obtain insurance on joint

account of *James Keith, junior, and himself*, upon the brig Sphinx from Alexandria to Canton and back, against all risks, " say on vessel $10,000, valued at this sum ; on specie $70,000." The sum insured by the Pacific Insurance Company was $30,000. The only designation of the assured in the policy is, that it stated that Le Roy, Bayard & Co., *on account of the owners*, do make insurance, &c. On the 31st March, 1818, the vessel sailed from Alexandria laden with 22 kegs and 17 boxes Spanish milled dollars, amounting to $90,000, the whole of the cargo, including premium on specie, commissions, &c. being valued at upwards of $100,000. The bill of lading, dated on the day of the sailing of the vessel, stated that $90,000 had been shipped by Charles I. Catlett, James Keith, junior, and Thomas R. Keith, one half being the property of Catlett and the other half the property of the two Keiths. The master of the vessel testified that after the 20th February, whilst preparing for his voyage, he heard James Keith say that he had given to his brother, Thomas R. Keith, on third of his interest in the shipment, and that he was to have a third in the profits. This declaration of James Keith was made in the presence of Catlett, who, on being asked, said that it would be an insurable interest, that they were short insured about $30,000, that he would write to Boston to effect further insurance, and that Thomas R. Keith's interest should be insured in the Boston policy. An insurance was accordingly effected at Boston, in the joint names of Catlett and the two Keiths, in the sum of $26,000.

Thomas R. Keith went out in the vessel as supercargo, to whom the master was instructed to deliver the cargo on his arrival at Canton, and who he was further instructed, would furnish him with a return cargo. The vessel arrived in distress at the Isle of France on the 29th July. She underwent a survey, and on the 14th August the surveyors reported that she could be repaired, but that the cost of repair would be $20,000 ; upon which report, and at the request of the captain, the court of vice admiralty there ordered the brig to be sold, and she was sold accordingly. The cargo, was delivered to the American consul at the Isle of France

the master and supercargo having selected him to take charge of it. The master left the Isle of France, and knew not what became of the cargo after its delivery to the con- sel. It appeared, however, that the supercargo invested it (specie selling at from 22 to 24 per cent. advance) in cotton, which he shipped to Liverpool in England. On the 16th November, 1818, the supercargo wrote to James Keïth, junior, (one of the plaintiffs,) stating that he had written per the master of the brig Sphinx on the 5th October, but as he learnt that he was detained at *Bourbon*, he had concluded to forward a copy of the protest, &c. He further stated, that not being able to procure a passage to Canton, he had invested his funds in Surat cotton, mentioning the price, which he said was high, but that at the time the purchase was made, the quotation from England would leave a profit, and from the information received, he thought it the best mode of laying out the funds; nor was this opinion altered until the evening before writing the letter, when he stated a ship had arrived from Bordeaux, which reported so differently from any thing he had heard at the Isle of France, that he was fearful that the result would be unfavorable, and expressed a hope that the plaintiffs had abandoned both vessel and cargo. On the 24th February, 1819, Le Roy, Bayard & Co. abandoned to the defendants so much of the cargo as was insured by them, in pursuance of instructions received from Catlett of the date of the 9th February. The national character of the vessel was described in the policy as *American*. The proof in support of this representation was an affidavit of Catlett, used as evidence by the defendants on the trial, stating that he and the two Keiths being native citizens of the U. S., were owners of the brig, and a copy of the register of the vessel from the treasury department of the U. S. (For a more particular detail of the facts of the case, see 1 Wendell's Rep. 561.)

In the *declaration*, after setting forth the policy, it was averred that before and at the time of the loss, &c. a certain large quantity of specie, to wit, $30,000, had been and were laden and put on board of the said brig to be carried, &c. and that the said plaintiffs were the owners of and interested

ALBANY,
Dèc. 1829.

Pacific In. Co.
v.
Catlett.

in the said specie to a large amount, to wit, to the amount of all the money by the said plaintiffs insured thereon, and that the policy was made on their account and for their sole use and benefit. At the trial a verdict was taken by consent for the plaintiffs, subject to the opinion of the supreme court, who gave judgment for the plaintiffs. (See 1 Wendell, 561.) The defendants sued out a writ of error.

The cause was argued here by

*R. Sedgwick* & *G. Griffin*, for the plaintiffs in error; and by

*J. Duer* & *D. B. Ogden*, for the defendants in error.

The points made on the part of the plaintiffs in error, and argued by the counsel, were the following :

1. The preliminary proofs were not sufficient to entitle the plaintiffs in the court below to recover; or, at all events, to claim interest upon the sum demanded until 1824.

2. There was no evidence that the repairs of the vessel would have cost half her value; consequently the assured were not entitled to abandon.

3. Incompetent and illegal evidence was admitted on the trial, and if the plaintiffs were entitled to recover, the share of Thomas R. Keith, (whether $\frac{1}{8}$ or $\frac{1}{4}$ of the amount insured,) should have been deducted.

4. There was no legal proof that the vessel was American and duly documented as such during the voyage insured.

5. Thomas R. Keith ought to have been made a co-plaintiff in the court below.

6. The Interest averred in the declaration is different from the interest proved.

7. The reception of the cargo at the Isle of France by Thomas R. Keith, and its investment in a new adventure, discharged the underwriters.

The following opinions were delivered :

By the CHANCELLOR. The plaintiffs in error have raised several objections to the recovery, all of which I shall consider, but not in the exact order in which they were argued. As the fifth and the sixth points go to the form of the action

as to parties and the averment of interest in the declaration, and are also materially connected with the merits of the cause, I shall first examine the questions arising upon those points.

1. Was the action properly brought in the names of Catlett and J. Keith, junior, without joining T. R. Keith as a co-plaintiff? To ascertain whether the latter was a necessary party we must enquire whether he had such an interest in the policy as to enable him to recover against the underwriters. The policy was made by the agents in behalf of the *owners* of the cargo, and the plaintiffs could not recover without showing themselves to be owners. The difference between the expression in the policy in this case and the usual one, " for whom it may concern," I apprehend to be, that if the policy is *in behalf of the owners,* no other person than the owner can recover, although he may have an interest in the subject by lien, *respondentia,* or otherwise ; but if the policy is *for whom it may concern,* a person who has only a special interest in the subject insured may sustain an action thereon. In either case it must appear that the policy was made in behalf of the persons who claim to recover. (*Steinback* v. *Rhinelander,* 3 Johns. C. 269. *Bodwy* v. *The Union Ins. Co.* Condy's Marshall, 473, note c. *Toppan* v. *Atkinson,* 2 Mass. R. 365.)

At the time the insurance was effected in this case, Thomas R. Keith had no interest in the proposed shipment. Whether the specie which was to compose the cargo had actually been obtained from the banks at that time does not appear ; but it is evident from the letter ordering the insurance that the parties only intended to have the interest of Catlett and J. Keith, junior, covered by the policy. Whether this letter was shewn to the underwriters or not does not seem to be material; but if it was so, the evidence was probably sufficient to authorize the jury to find that fact. Agreeably to the authorities which I have before referred to, if the agent did not intend to insure for the benefit of Thomas R. Keith, he could not be benefitted by the insurance whether the letter was communicated to the underwriters or otherwise. If no cargo had been put on board in which the assured had an

interest as owners, the risk would not have attached, and they would have been entitled to a return of the premium. It is not material, therefore, to enquire who were the owners of the dollars at the time the policy was underwritten, except for the purpose of ascertaining whose interest was intended to be insured. From the testimony of the master it appears that at the time of the shipment the assured were the owners of only five sixths of the $90,000, and the policy only attached upon their undivided interest. If the insurance had only been upon a particular number of the Spanish milled dollars to the amount of thirty thousand, the assured would only have been entitled to recover their portion of the loss on that number; but it was upon their interest in the whole cargo, both for the outward and return voyages, to the extent of $30,000. The assured were owners of the cargo at the time of shipment to the extent of $75,000 exclusive of premiums and commissions, and I presume the $22,394 recovered in this suit was the fair proportion of the actual loss, including interest and deducting salvage, which the underwriters in this case were liable to pay.

2. Was the interest of the assured, as averred in the declaration, different from the interest proved? The averment is that a large quantity, to wit, 30,000 Spanish milled dollars, were laden on board the brig to be carried on the voyage, and that the plaintiffs were then and until and at the time of the loss " the owners of and interested in the said specie to a large amount, to wit, the amount of all the money by the said plaintiffs insured thereon," and that the policy was made on their account and for their sole use and benefit. The quantity of specie on board is laid with a *silicet*, and the plaintiffs were not confined to the precise quantity mentioned in the declaration. The averment of interest is not of an entire interest in the whole cargo; but the plaintiffs aver they were owners of and interested in the cargo to the amount insured thereon.

The case of *Page* v. *Fry*, (2 Bos. & Pul. 240,) is directly in point in favor of the assured as to this manner of averring interest. As I understand that case, Hyde and Hobbs ordered an insurance on account of themselves and Hacks, to whom they had assigned an interest in the cargo; and the

agent, instead of insuring on account of all, insured in his own name, for and on account of Hyde and Hobbs only. It must have been a valued policy, and the only necessity of any averment or proof of interest was to take it out of the statute 19 Geo. 2, ch. 37, against what are usually denominated wagering policies. The suit was brought in the name of the agent, and the averment was that Hyde and Hobbs, on whose account it was made, were interested in the cargo to a large amount, to wit, to the amount of all the money ever insured thereon. The judges all consider it as a case where the value of the interest was not material, which could not have been so, if it was an open policy. Heath, J. says: "I do not see why a joint tenant or a tenant in common has not such an interest in the entirety as will entitle him to insure. A policy made by a person so interested is not to be considered as a wager policy." And Chamber, J. says: "The averment in substance is nothing more than that the parties for whose benefit the insurance was made had an interest in the subject of that insurance. They are not bound by the terms of the averment to shew any thing more than that they have an interest; and if they show an interest to the extent of one hundredth part of the cargo it will be sufficient. The spirit of 19 Geo. 2 only requires that the policy should not be a gaming policy." In that case the question was whether Hyde and Hobbs had an insurable interest in the whole cargo of any value, as if they had, they were entitled to recover the amount at which that interest had been valued. In this case the averment is substantially the same; but it being an open policy, the assured are bound to prove that they were owners and had an interest in the cargo, and that the value of the part or share which belonged to them was equal to the sum claimed against the underwriters. In any possible view of the case, they had an interest to that extent. If the testimony of the master is legal evidence on the question of interest, they owned five sixths of the cargo; and if we reject that, and resort to the bill of lading, Catlett owned $45,000, and J. Keith had an interest to some extent at least in the other $45,000. If it did not exceed one dollar, their joint interest

ALBANY, Dec. 1829.

American Ins. Company v. Catlett.

far exceeded the amount underwritten by the plaintiffs in error ; and the averment that they were owners and interested in the cargo to the full amount insured is supported by the proofs in the case.

The case of *Page* v. *Fry* was not overruled by that of *Bell* v. *Ansley*, (16 East, 141.) In the latter case the insurance was in fact made for John Bell and his brother William, who were jointly interested ; and the averment was that John Bell was interested to the amount of all the monies insured, and that the policy was made for the use and benefit and on account of John Bell ; and the decision is put upon the ground that the averment that the policy was made on his account was material under the 19 Geo. 2, and should have been truly stated. The case of *Page* v. *Fry* was doubted by Chief Justice Marshall in *Graves* v. *The Bolton Marine Insurance Company*, (2 Cranch, 441.) If, as he supposed, the plaintiff was permitted under that policy to recover any thing on account of Hacks' interest in the cargo, the case cannot be law ; but if, as I have endeavored to show, he only recovered the amount at which Hyde and Hobbs' interest was valued in the policy, it does not interfere in the least with the doctrine the chief justice was endeavoring to establish. In the case then before him the insurance, although intended to be made by one partner for the benefit of himself and his co-partner, was made in his own name, and the company supposed they were insuring his own interest only. In that case, as the policy was an open one, the plaintiff had no right to recover for any interest which his co-partner had in the property. No averment could have remedied the defect. The chief justice says, that under no rule for proceeding on a special contract could the interest of a co-partnership be given in evidence on an averment of individual interest, or could an averment of the interest of a company be supported by a special contract relating in terms to an individual. There was no doubt in that case of the right of Graves to recover the full amount of his loss, and the defendants acknowledged themselves liable to pay him, but they denied their liability to pay the loss of his partner who was not insured. I do not therefore understand the chief justice as intending to say Graves' own interest in a

moiety of the cargo could not be given in evidence and re-
covered for under an averment that he was interested to the
amount insured. Judge Thompson so understood the deci-
sion of that court when this cause was before him in the circuit
court of the United States. He says: "It is equally clear
that if the insured aver an entire interest in themselves in the
subject insured, such averment cannot be supported by evi-
dence of a joint interest with others. Nor can an averment
of a joint interest with others be supported by proof of a sole
interest. As I understand the declaration in this cause, it on-
ly avers a joint interest in Catlett and James Keith, junior, to
the extent of $30,000, and not an exclusive interest in the
entire cargo." (1 Paine's R. 615.) The conclusion at
which I have arrived on this point is, that there was no vari-
ance between the declaration and the proof as to the extent
of the plaintiff's interest, or as to the person on whose account
the insurance was made.

3. Were the preliminary proofs sufficient; and was there
sufficient evidence to authorise a jury to find they were ex-
hibited to the underwriters in 1819? I can see no possible
objection to the preliminary proof, as produced on the trial;
and it appears to me there was sufficient to authorise the ju-
ry to infer that all the evidence of loss and interest which
could reasonably be required, was exhibited early in the year
1819. The letter of abandonment was delivered on the 24th
of February; to which was annexed the protest of the mas-
ter, showing the injury to the brig by the perils of the sea,
and her condemnation at the Isle of France. The survey
is not printed at length in the case, but it must have describ-
ed the injury substantially as testified to by the master on
his examination as a witness in the cause. It also stated the
fact that the brig could not be repaired at that place short
of $20,000. The letter of Thomas R. Keith, of the 16th of
November, 1818, was also presented at the same time: by
which it appeared that the voyage was lost, as to the cargo,
in consequence of there being no means of sending it on, or
procuring a passage to Canton; and that he had been oblig-
ed, after waiting a long time, to invest the specie in cotton
to be sent to England. The preliminary proof of loss was

therefore much stronger than the proof in chief on that point; for these documents were not admissible as evidence in chief in the cause. The proof of interest was not made at the same time; but in the letter of abandonment the agent says the proof of interest will be made without delay. Accordingly, we find an affidavit made by the assured three days afterwards at Alexandria, showing that they caused the insurance to be made; and on the 2d of April, in the same year, another affidavit was made by Catlett with the original invoice of the cargo annexed. In 1824, Sands, the vice-president, made out a list of the papers which had previously been exhibited to the company as preliminary proofs; and among others, in addition to those above mentioned, are the bill of lading and various others of less importance. No objection appears to have been made to the payment on account of a want of interest; and if the bill of lading was exhibited, it was good evidence even in chief to show that the assured had an interest in the shipment to an amount exceeding $45,000. I think, from the agreement of the 26th of July, 1819, in connection with the list of documents exhibited and other evidence in the case, it is fairly to be presumed that the preliminary proofs, both of loss and interest, were exhibited previous to that time so far as they were required by the underwriters; and if there is any error as to the interest, it is in their favor, on the ground that it was only computed from the beginning of the next year, instead of commencing on the 26th of August, 1819.

4. Was there any evidence to justify the jury in finding that the brig was injured to more than half her value? The difficulty on this point has probably arisen from the fact that it was considered so clear that neither party had their attention particularly directed to it when the master's deposition was taken. He does not in terms say he was satisfied the repairs would cost $20,000 at the Mauritius. He says the surveyors reported that fact, and that upon their report and on his request the vessel was sold. If the witness had been examined in open court, and the objection raised, the question would undoubtedly have been put to him directly, and answered in the affirmative. I think we have a right to pre-

sume he intended so to be understood at the time he made
the deposition. The value of the brig is not proved; but
she was insured for $10,000, which probably was the full
value of a brig of 359 tons, of her age, with a single deck;
and there was a technical total loss unless her value was
more than $26,600. The master describes the nature of
the injury in such a manner that any person acquainted with
the subject must be satisfied extensive repairs would neces-
sarily be required; and from our geographical knowledge
of the situation of the Isle of France, it is evident the ex-
pense of repairs at that place must be comparatively great.
I think, with the supreme court, that the proof of a techni-
cal total loss of the brig was *prima facie* sufficient.

5. But it is alleged illegal evidence was received on the
trial, and that the share of T. R. Keith should at all events
have been deducted from the amount recovered. The latter
part of this point does not appear to have been raised at the
trial; and as it appears as a written appendage to the print-
ed point, it is evidently a *novus hospes* here. If I am right in
supposing that the policy attached upon $30,000 of the
plaintiffs' undivided interest in the whole cargo, and not
upon 30,000 in number of the spanish milled dollars, ther e is
no foundation whatever for claiming such a deduction. It
does not appear upon what principle the adjustment of the
loss and the apportionment of salvage was made, but we must
presume it was settled agreeably to the rights of the several
parties, and in reference to the principles adopted by the su-
preme court. The illegal evidence complained of is the cor-
respondence relative to the Boston policy; and the conver-
sations testified to by the master, as to T. R. Keith's having
a share in the adventure. If the fact that a subsequent pol-
icy, on $26,000 of the cargo, was made with the Boston
company, in the names of the plaintiffs and T. R. Keith,
could have any possible bearing on the case, either party
had a right to prove that fact; and if it could not, neither
party has been injured by the admission of the evidence. I
see no objection to the proof of the conversation between the
plaintiffs, as testified to by the master, to shew the fact that
one of them had agreed to let his brother come in for a share

of the adventure. It only shews that T. R. Keith had an interest in the cargo before it was put on board, while the bill of lading would only shew an interest from the time of shipment. Independent of this testimony, the evidence is conclusive that his interest, if he had any, was not intended to be insured by the policy on which this suit was brought; and whether he was the owner of one fourth or only one sixth of the cargo, cannot alter the rights of the parties to this suit.

6. Was there legal proof as to the national character of the vessel, and that she was duly documented as American? The underwriters had a right to use any of the preliminary proofs produced by the other party on the trial as evidence in chief, but when they objected to certain parts of those documents being read by the plaintiffs as evidence in chief, they expressly excepted from the objection the affidavit of Catlett of the 2d of April, 1819, and some other documents. I therefore consider them as having elected to use those documents as evidence in chief before the jury. By that affidavit it appears the owners of the brig were all native citizens of the United States, and in the invoice she is described as the American brig Sphinx of Alexandria. The register, on the condemnation of the vessel, is required to be returned to the treasury department. On the trial, an exemplified copy of the register, under the seal of that department, was produced, on which was endorsed a memorandum that it was received at the department on the 26th of June, 1819, and that the vessel had been condemned as unseaworthy at the Isle of France. I think this was *prima facie* evidence that the register was on board the vessel for the voyage. General evidence is all that is necessary in such cases, until some doubt is thrown on the question. (*Ocean Ins. Co.* v. *Francis*, 2 Wendell's Rep. 64.)

The only remaining point in the case is, whether the investing the cargo in cotton at the Mauritius discharged the underwriters. If the assured had been there and had elected to abandon, it would have been their duty to take care of the property for the benefit of the salvage; but if they had invested it in a new adventure, and neglected to abandon until they ascertained it to be an unprofitable speculation, their

right to abandon would have been gone. There is no evidence, however, from which it can be inferred that the assured were informed of the impossibility of sending on the cargo, until the receipt of the letter of the 16th of November, 1818. They abandoned the first opportunity they had after they were informed that a technical total loss had occurred; and if T. R. Keith had no right in behalf of himself and the other owners of the property to receive it from the master, so as to deprive the assured of their rights as against the underwriters, they cannot be affected by his investment of the proceeds in the cotton, when it would have been the duty of the master to make the same investment for the benefit of all concerned. As I understand the case, no vessel could be procured to send on the cargo to Canton, and it was necessary to do something with it for the benefit of salvage, and to prevent an absolute total loss. Although it was in dollars, it must for such a voyage and in such a situation be considered the same as any other kind of merchandize. If there had been a regular course of exchange between this and the Mauritius, it probably would have been the duty of the master to sell the cargo and remit the proceeds thereof to the owners, but it is pretty evident that no such exchange could be procured; the cargo must therefore be sent home, or invested in something by which the proceeds could be remitted to this country. The most judicious course undoubtedly was to invest it in something which could be sent to England or France, and the proceeds remitted from thence to the United States. I do not understand that the specie was invested in cotton for the purpose of speculation, but as a means of remitting the proceeds of the cargo to this country with the least amount of loss; and as the quotations from England then were, there was a prospect that even a profit might be made, so as to discharge the underwriters from all claim for even a partial loss.

In this view of the case, the agent was doing the best that could be done for their benefit, or the benefit of whom it might concern; and although there was a loss on the cotton, it is probable there would have been a loss to the same extent in any thing else in which it might have been invested

at that place.  For the reasons given by Judge Thompson on this point, when the case was before him, (1 Paine's Rep. 617,) I do not think the right of the assured to abandon was taken away by the acts of Thomas R. Keith at the Isle of France, and that the underwriters were liable for a total loss with the benefit of salvage.

The judgment of the supreme court should therefore be affirmed.

By Mr. Senator S. ALLEN.  The counsel for the plaintiffs in error contend that the preliminary proofs were insufficient to authorise a recovery in the court below; or, at all events, to establish a claim for interest previous to 1824. I understand by the term preliminary proof, that in order to avoid a nonsuit, it is incumbent on the assured to prove the loss of property, and an insurable interest in such property. These facts, according to my view, were clearly made out by the assured when they produced the protest of the master, detailing the particulars of the survey and condemnation of the vessel, and the defeat of the voyage, together with the oath of Charles I. Catlett and James Keith, junior, proving their interest in the amount insured.  In the case of *Lenox* v. *United Ins. Co.*, (2 Johns. Dig. 78,) it was held, that when a loss is to be paid in 30 days after proof thereof, the protest of the master stating the loss, and the bill of lading and invoice, are sufficient preliminary proofs.  That these proofs were furnished, I think is evident from the testimony of Austin L. Sands, who saw them in the insurance office in 1824, when he made a list of them; and that they had been in the possession of the company since the 26th of July, 1819, appears by the agreement entered into between the company and the assured, by which the assured are authorised, without prejudice to either party, to take the proceeds of the cotton then in the hands of Cropper, Benson & Co. of Liverpool, and in case of a recovery against the underwriters, they were to be credited for the amount of the proceeds of the cotton.  The only proper conclusion is, that the company having received sufficient proof of loss and interest to authorise a suit, they were willing, in order to avoid addition-

al expense, in case of a recovery, to enter into the agreement alluded to ; and if this fact is established, then the plaintiffs in the court below were entitled to interest from the day on which the proofs were furnished.

2. It is contended, also, that there was no evidence that the repairs of the vessel would have cost half her value, and therefore the assured had no right to abandon.

Charles I. Catlett, in his letter of the 29th of January, 1819, to Le Roy, Bayard & Co., requests them to effect insurance on the vessel, *ten thousand dollars*, valued at that sum. This, I should presume, was pretty good proof of the value of the vessel, while she was at her port of departure at least. In the deposition of the captain, he states that the surveyors reported that it would cost to repair the brig at the Isle of France as much as 20,000 dollars ; and surely, when the owners value their vessel at $10,000, it will not be contended that she was worth at the Isle of France $40,000! If, therefore, any reliance may be placed on this part of the evidence, it appears to me the fact that the repairs of the vessel would cost more than half her value is clearly made out. It appears also that the *loss* of the vessel was never disputed by the parties ; for Sands, the vice-president of the company, states that he never understood there was any question as to the loss of the vessel, and Jones, who was secretary to the company, says that he never heard any doubt expressed on that subject.

3. It was contended further, that incompetent and illegal evidence was admitted on the trial, and that there was no legal proof that the vessel was *American* and duly documented as such during the voyage insured.

It would be the height of presumption in me, even to doubt the legality of the evidence admitted on the trial of the cause, after it had been allowed, both by the circuit and supreme court of this state. I proceed upon the principle, therefore, that the evidence adduced in the case is not illegal, but proper and admissible testimony.

In proof that the vessel was American, we have the oath of Catlett, that he and the Keiths were the owners of the

VOL. IV. 12

ALBANY,
Dec. 1829.

American Ins.
Company
v.
Catlett.

brig, and that they were all native citizens of the United States; and also a certified copy of the register, duly authenticated by the secretary of the treasury. The law of the United States makes it necessary, before a register can be obtained, that the owner shall declare under oath the name, burthen, place and year of the building of the vessel, and that she is the entire property of citizens of the United States; and in case such vessel shall be lost, or otherwise prevented from returning to the port to which she may belong, the certificate of register, if preserved, shall be delivered up within eight days after the arrival of the master, to the collector, &c. The register of the brig Sphinx was returned on the 26th of June, 1819, and a true copy of it furnished on the 14th of March, 1826. The proof that the vessel was American therefore, in my view was clearly made out.

4. Another of the points strongly insisted on by the counsel for the plaintiffs in error was that Thomas R. Keith was a partner in this concern, and therefore ought to have been made a co-plaintiff in the court below; and if he was one of the owners of the property, the reception of the cargo at the Isle of France and its investment in a new adventure, discharged the underwriters from liability. On the 2d day of April, 1819, Charles I. Catlett makes oath that he, together with James Keith, junior, and Thomas R, Keith, are the owners, and the only owners of the cargo mentioned in the annexed invoice and affidavits, he being owner of one half thereof, and James Keith, jun. and Thomas R. Keith being the owners of the other half. If the case rested on this testimony alone, the judgment of the court below perhaps ought to be reversed and a new trial ordered; but, in order to a correct understanding of what the interest of Thomas R. Keith was, it is necessary and proper to advert to all the testimony bearing on the case, in connection with the circumstances attending the transaction.

The oath of Catlett does not necessarily imply that Thomas R. Keith was interested in the $30,000 insured by the Pacific Insurance Company; for the fact is, that the policy was truly intended to cover the interest of C. I. Catlett and

James Keith, junior, as is evident from the request of Catlett
to Le Roy, Bayard & Co.; the letter containing which re-
quest, as appears from the evidence of William Bayard, jun-
ior, was shewn to the company when the policy was effect-
ed. In that letter Catlett requests that insurance may be
effected on joint account of *James Keith, jun. and himself,*
and the policy for the $30,000 was dated the 2d of Feb-
ruary. Captain Page, the master of the vessel, testified
that between the 20th and last day of February, he heard
James Keith, jun. say, while in the counting room of Cat-
lett, that he had given his brother Thomas one third of his
interest in the shipment, and that he was to have a third of the
profits; that he (Page) neither knew nor had reason to be-
lieve, before this, that T. R. Keith had, or was to have any
interest in the shipment; he knew that James Keith, junior,
was a man of wealth, and that the money was furnished by
him, and that T. R. Keith had no money to ship upon the
voyage. He has no doubt, and verily believes that T. R.
Keith had no interest in the shipment until about the time
James Keith, jun. made this declaration; that when the dec-
laration was made, James Keith, jun. stated that he *presumed*
it would be an insurable interest; upon which Mr. Catlett
observed that it would be insurable, and that they were
short insured about $30,000, and that he would write to
Thomas R. Perkins, of Boston, to effect further insurance,
and that T. R. Keith's interest should be insured in the Bos-
ton policy.

Now, it is evident, I think, that Catlett intended, when he
wrote to Le Roy, Bayard & Co. to effect insurance, that only
the interest of himself and James Keith, jun. should be cover-
ed. Of this there cannot be a doubt, as at the time of
writing the letter, and at the date of the policy made by the
Pacific Insurance Company, he could have no knowledge of
the intention of James Keith, jun. to give his brother an in-
terest in the shipment, nor did he know it until 18 or 20
days after, when the conversation in his counting room was
had. This fact is still further corroborated by his reply to
Keith that the interest he had given his brother was an in-

surable interest, and that such interest should be insured in the Boston policy; and also by his letter of the 5th of March, to T. R. Perkins, requesting him to effect insurance in Boston on $26,000, on specie out and merchandize home, on account of James Keith, jun. Thomas R. Keith and Charles I. Catlett; *and that James Keith, jun. and himself* had already effected insurance on 80,000 dollars. From these circumstances, and the testimony of the captain that he had good reason to believe Thomas R. Keith had no money to ship on the voyage, but that James Keith, jun. was a man of wealth, and from the doubting manner in which James Keith, jun. observed that he *presumed* the interest he gave his brother would be an insurable interest, I have arrived at the conclusion that the interest intended to be given to T. R. Keith was no more than an interest *in the profits* of the voyage, not an interest in the property; for it can hardly be supposed that his brother would make him a present of the one third of this large sum; for had this been his intention, the doubt as to an insurable interest would never have been raised in his mind. The interest he had, therefore, was an additional commission, should the voyage prove profitable; and these profits, which he had a right to anticipate, were covered by the Boston policy.

A supercargo who is to receive a compensation out of the homeward cargo, as he begins to render his services at the commencement of the voyage and so continues, sustains an absolute loss of his time and skill in case the cargo does not arrive. An insurance upon his interest is therefore strictly a contract of indemnity; and where the owners of a cargo agreed to pay the supercargo $10,000 out of the proceeds of any cargo the ship might bring from Batavia, or to deliver him part of such cargo to that amount on the ship's arrival at New-York, it was not made a question that the supercargo had an insurable interest to that amount. (Phillips on Insurance, 44.

This being the interest of Thomas R. Keith, therefore, and that interest being covered by the Boston policy, the allegation that he ought to have been made a co-plaintiff in the suit below, in my opinion, falls to the ground. I am unable,

ALBANY,
Dec. 1829.

American Ins.
Company
v.
Catlett.

under all the circumstances of the case, to view T. R. Keith in any other light than as supercargo of the vessel. That he was thus constituted by Catlett and his brother is evident from their letters of instruction both to him and the captain.

As to the transactions at the Isle of France in relation to the cargo of the vessel, it appears by the deposition of the captain that the surveyors ordered that the cargo should be landed, which was done on the 1st of August, 1818 ; that he delivered the specie to Mr. Bickham, the American consul, as the agent of T. R. Keith, and believed it the best course he could pursue for those who might be interested in the cargo. Having delivered up the cargo he left the Isle of France, and had no knowledge of what became of the specie after he left there. By the letter of T. R. Keith to his brother of the 16th of November, 1818, it appears Capt. Page left the place on or about the 5th of October in a ship for Havre to touch at Bourbon, and that a letter was wrote by this vessel informing of the disaster to the brig, but the vessel being detained (Nov. 16th) at Bourbon, he concludes to send on the protest, &c. ; from all of which it appears that after the condemnation of the Sphinx, the supercargo waits in the hope of procuring a passage to Canton, but being tired of waiting, he invests the specie in cottton, which, from the information he had received, he thought the best mode of laying out the funds. Had I a vessel here, he observes, I should have acted in a different manner, and should have gone to India in search of a cargo, &c.

The voyage being thus broken up, and no ship to be had to take the cargo to the port of destination, the assured had a right to abandon, and the captain or his agent was authorized to act for the benefit of whom it might concern. Whatever was right for him to have done, if it had been his own ship and cargo, the underwriters must answer for the consequence of it. (Phillips on Insurance, 399.)

The specie was landed on the 1st, and the vessel condemned on the 15th of August, 1818. The captain left the Isle of France on the 5th of October, near two months after the cargo was landed and the voyage broken up, and he avers that there was no opportunity from the Isle of France

by which the cargo of the brig could be sent to Canton; and further, that he does not know of his own knowledge what became of the cargo of specie. The purchase of the cotton, therefore, must have been made *after* he left the island. It would seem, therefore, that the supercargo waited about three months in the hope of procuring a passage to Canton before he made the investment in cotton, and as the agent of the captain, if he acted in good faith and with a view to the benefit of the concern, the underwriters are, in my humble opinion, liable for the loss whatever it may be.

It was urged by counsel that instead of investing in cotton, the specie might have been sent to England, or that bills of exchange might have been bought with it; but if it was the duty of the supercargo to act for the benefit of all concerned, and he, believing this investment to be for their benefit, which he was warranted in, from his then information as to profit, and the large advance obtained on the specie, he would have acted wrong, in my opinion, to have sent the specie instead of the cotton to England. As to purchasing bills of exchange, it is by no means probable they were to be had at a place of limited commerce and business, such as the Isle of France is, and which is resorted to as a port of refreshment for vessels bound to India, rather than a place of extensive trade.

On a review of the whole subject, therefore, I am of opinion that the interest of Thomas R. Keith was not such as to create a co-partnership in the concern, and therefore that he ought not to have been a co-plaintiff in the court below; and not bring the owner of the property as such, his acts at the Isle of France were of the same force and effect as if done by the captain, who, after abandonment, becomes the agent of the underwriters; and therefore that the judgment of the court below ought to be affirmed.

And all the members of the court, with the exception of one senator, concurring in the opinion that the judgment of the supreme court ought to be affirmed, it was thereupon affirmed accordingly with costs.