[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 80 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 81 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 82 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 83 
Lee Hall, the plaintiffs, were lumber commission merchants, and, for several years prior to August 2, 1856, were in the habit of receiving from Adsit Co., the defendants, consignments of lumber for sale. On that day, lumber of the defendants to the value of about $5,000, remaining unsold in the plaintiffs' yard, was destroyed by an accidental fire. This action was brought to recover a balance of account for charges and advances over and above the proceeds of the lumber sold. The plaintiffs' demand is not questioned; and the whole controversy grows out of the defendants' claim on account of their loss by the fire.
A referee allowed this claim, and judgment was entered on his report against the plaintiffs for $2,116.50, with interest and costs. Exceptions were taken, and, on the plaintiffs' appeal, a General Term sitting in the third district reversed the judgment and granted a new trial. The defendants appealed to this court, consenting that in case of affirmance judgment absolute be rendered against them.
The complaint alleges that it was "expressly agreed * * that the plaintiffs were not required to effect any * * insurance against fire, * * and that so far as concerned the *Page 84 
plaintiffs, the defendants should take the risk." The answer contains two separate defenses. The first defense echoes, in its precise words, a denial of this alleged express agreement; but it contains no claim on account of the loss. That claim is set up in the second defense, which recites what it alleges to be "the entire agreement."
As stated, this agreement consists of ordinary stipulations between a consignor and consignee on other matters, but without any which could be construed as referring to insurance, and without any allusion whatever to that subject, except a statement that the agreed eight per cent commission to the plaintiffs was to be in full for sales, guaranty, and all charges connected with receiving, piling, storing and sale, "not including charges for insurance." The defense does not allege instructions to insure, but avers that the defendants "never did, at any time or in any manner, forbid or prohibit the plaintiffs from procuring and effecting, as such factors as aforesaid, for the security and benefit of the defendants, an insurance or insurances on the lumber." Except in the somewhat indirect and incidental way hereafter particularly stated, the defense does not intimate that there was any duty to insure; and, except by reason of the insurance actually effected by the plaintiffs, it does not make any claim against them.
The precise ground of defendants' claim is thus stated: Prior to January 1, 1856, the plaintiffs, without the defendants' knowledge, constantly kept on foot insurance effected in their own names, upon all lumber held by them in trust or on commission; the expenses of such insurances assignable to plaintiffs' lumber did not exceed one-half of one per cent on the sales thereof; the plaintiffs, concealing their said insurances and the cost thereof, fraudulently, with intent to extort, etc., charged to defendants, from time to time, as upon insurance by the plaintiffs personally, and not as and for the expense of procuring insurance, a larger sum than such actual cost; and prior to January, 1856, the defendants protested against such charges, and refused to pay such percentage thereafter. *Page 85 
This defense then alleges that in 1856, prior to the loss in question, but without express directions, the plaintiffs, as they lawfully might, and as they were bound to do, in the proper and faithful discharge of their duty to the defendants as factors and consignees, "did procure and effect * * insurances * * upon lumber held by the said plaintiffs in trust or on commission." It further alleges that these insurances covered the defendants' interest; that on learning of their existence after the loss, the defendants notified the plaintiffs that they adopted and ratified the same as having been effected for their benefit, and that afterward the plaintiffs recovered the whole amount insured.
The following facts appeared on the trial: At the time of the fire, the plaintiffs held policies, amounting, in the aggregate, to $30,000, by the terms of which the insurers "do insure Lee 
Hall against loss or damage by fire on lumber, their own, or held by them in trust or on commission, or sold, but not delivered, contained" in their lumber yard. The policies required the insured to furnish a statement and an affidavit of the interest of the assured therein; and they also contained a printed clause in these words: "Property held in trust, or on commission, must be insured as such, otherwise the policy will not cover such property; and, in case of loss, the names of the respective owners shall be set forth in the preliminary proofs of such loss, together with their respective interests therein."
There was in the plaintiffs' yard at the time of the fire, and destroyed thereby, not only the defendants' lumber, and about $4,000 worth of lumber belonging to James Morgan Co., held on the same terms, but also $30,000 worth of lumber held on commission from other consignors, for whom the plaintiffs had agreed to insure at specified rates. The plaintiffs included in their claims upon the insurers the lumber of this latter class, received substantially the whole amount insured, and paid it over to their consignors. But they made no claim upon the insurers for the property of the defendants, or of James Morgan Co. *Page 86 
For the business of 1853, the plaintiffs charged and received from the defendants one and one-half per cent on account of insurance. Then, and before the business of 1854 commenced, the defendants refused to pay one and one-half per cent for insurance, on the ground that it was too much. At the close of the years 1854 and 1855, accounts were settled between the parties, no charge being made for insurance in either instance. At an interview between the defendant Adsit and the plaintiff Lee in 1856, before the business season commenced, Adsit expressed a willingness to pay one per cent for insurance, but Lee charged one and a half per cent, which Adsit refused to pay. In the winter of 1855-6, Adsit stated to two persons that the defendants did not get their lumber insured, but ran their own risk, or insured themselves.
The defendants had no knowledge of the insurances in question until three days after the fire. They then gave the notice of adoption and ratification alleged in the answer. The plaintiffs paid no attention to this notice.
The defendants' lumber, being piled separately, was not included in the inventories taken by the plaintiffs at intervals of ten or fifteen days during 1856, for the purpose of keeping their insurances full. Each of the plaintiffs testified that he did not intend to insure the defendants' lumber.
The referee decided that the plaintiffs were not required by law to insure, or to obtain insurance on the defendants' lumber, but that the defendants' lumber was embraced within the terms of the description of the subject insured, contained in the policies, and that no parol evidence was admissible to vary or contradict the same. Most, if not all, the facts which have any tendency to show that the insurances were not designed to cover the defendants' interest were proved under objection, and were ultimately excluded and disregarded by the referee as inadmissible. This was on the ground that the terms or legal meaning of the policies could not be contradicted or varied by such evidence.
The referee found that the defendants had no notice of the insurances having been effected; but nothing in his findings or in the evidence gives the least color for any imputation on *Page 87 
the motives or good faith of the plaintiffs. The case involves nothing but pure questions of law. I proceed to examine these questions.
I. Rightly understood, the answer does not allege that the plaintiffs were bound to insure the defendants' lumber, or to procure any insurance thereon. Its only reference to a duty in that respect is merely incidental, and by way of an argument in support of the defendants' alleged right to adopt the insurances which were actually effected. No fact is found having any tendency to establish such a duty; and the express finding of the referee that it did not exist does not appear to have been objected to.
Not only was there no affirmative proof, but the negative was shown. There was no conflict, and the evidence given, if legally admissible, showed a perfect understanding between the parties that the plaintiffs were not bound to insure or procure insurance for the defendants, and were not to receive any compensation for so doing.
The terms of the second defense, and of the notice of adoption given by the defendants after the loss, alike imply a concession that in this act of subsequent adoption lay all the defendants' claim to indemnity. If necessary, it may be added that, according to the whole current of authorities, an agent for sale is not bound to insure for his principal unless expressly instructed so to do, or an understanding to that effect between him and his principal can be implied from circumstances. (Story on Agency, § 111.)
II. That a contract made for his benefit but without his consent or knowledge may be ratified and adopted by a principal, whether made in the agent's name or in his own, may be assumed. Perhaps, if made by a total stranger, or by a special or general agent contrary to an express prohibition, the contract might still be subsequently adopted. Nay, if a principal, desiring to curb an officiously disposed agent, should exact from him a bond to abstain from any such action, it may be that, in case his interest should dictate, he might elect to adopt a contract perversely made for his benefit by the agent, despite of all his precautions to prevent it. *Page 88 
The rule that a subsequent ratification is equivalent to an original authority, and has a retroactive energy, is highly beneficial. I shall not attempt to define its extent, or the boundaries by which its influence may be limited. (17 Penn. 298.)
If, upon all the admissible evidence in this case, it could be adjudged that the insurances in question were made for the defendants for their benefit, or to cover their interest in their lumber, then it may be assumed that they had the right of adoption to the whole extent claimed.
III. Contracts made by an agent in his own name for the benefit of his principal, or his principal's business, may generally be enforced by and against his principal. And the action on such contracts may be brought by or against the agent, or by or against the principal. (Story on Agency, § 161; Dykers v.Townsend, 24 N.Y. 57.)
The contract of insurance is not regarded as a wager, irrespective of interest, that the res shall not be destroyed or injured by the peril insured against. It is a contract for indemnity, and its real subject is the interest of the person insured in the res. The reason of this is obvious. The res is constantly under the control of the insured, and the risk may be diminished in proportion to his vigilance and good faith, and enhanced if he be careless or dishonest. It is of the utmost importance to insurers to know the person whom they insure; and, therefore, policies of insurance in the ordinary form are not within the general principle that an agent may take a contract in his own name for the use and benefit of his principal. The ordinary policy covers no interest save that of the party named as the assured. But it often happens that insurers are content to insure whomsoever it may concern, relying upon the character of the person to whom the insurance is granted, as a sufficient warranty of the fairness of his principals; or, without any such prudential reflertions, they may choose to take the risk. When this is the case, the policy is framed accordingly. For this class of cases various formulas have been adopted. Sometimes A is insured as "agent." Sometimes the insurance is for "owners," or "for whom it may concern." *Page 89 
In all these cases it is well settled that, in prosecuting a claim against the insurers, extrinsic evidence may be, and must
be, resorted to for the purpose of ascertaining the interests intended to be covered; and, as the insurers are not always possessed of any information themselves, the intent of the agent in effecting the insurance, or of the person under whose instructions he acted, is oftentimes the only guide. Mr. Duer, in his ninth lecture, section twenty-two, lays down the doctrine as follows: "The terms used, however broad and comprehensive, must also be restricted to those for whom the insurance was in fact intended, and by whom it was previously directed or authorized, or subsequently, in due season, adopted. All other persons, although they may equally fall within the description in the policy, are not parties, but strangers to the contract. An insurance on goods on account of whom it may concern, is capable of being applied to the interest of every person who is proved to have shipped goods in the vessel on the voyage described; but where an action is brought on the policy, it is not sufficient to show that the person in whom the interest is averred was owner of the goods to which the insurance might extend. To warrant a recovery in his behalf, it must be shown that he was a party to the contract by evidence of the additional facts that I have stated." (2 Duer on Insurance, p. 30.) In the same section he says: "It is needless to cite authorities to show that in England or in the United States the general words of the policy are restricted to those for whom the insurance was intended. * * * The benefit of the contract, notwithstanding the generality of its terms, is limited to those on whose behalf it was in reality effected, that is, for whom the insurance was intended." (Id. pp. 33, 34.) Further on, at page 37, he states that the intent of the agent to insure his principal may be inferred from certain circumstances without direct affirmative proof, and carefully adds: "But where the proof establishes that his (i.e., the principal's) interest was not intended to be covered, it forms an insuperable bar to a recovery. Its necessary legal effect is to exclude him from all privity in the contract." *Page 90 
Phillips on Insurance (3d ed. p. 213, § 383) states this to be the law with equal precision, but with much brevity: "A policy made in the name of a particular person `for whom it may concern,' or with any other equivalent clause, will be applied to the interest of the party or parties, and only the party or parties, for whom it is intended by the party who effects it,
if such party has authorized its being made beforehand, or subsequently adopts it." These positions are fully sustained by the authorities, and, indeed, are quite familiar; yet it appears from his opinion that the learned referee in this case was governed, in some degree at least, by a supposal that in another part of their works these same writers had laid down an opposite rule. The extent to which in this class of cases resort may be had even to a mere emotion of mind on the part of the agent or person effecting the insurance is well exemplified in Mr. Phillips', sections 384, 385.
The policy now in very common use, by which an agent is insured against property, "his own, or held by him in trust or on commission," was devised to enable a factor or commission merchant to keep insured, as far as occasion might require, and without inconveniently numerous applications to the insurers, a stock that was not only fluctuating as to articles but as to owners.
These policies are not expressed to be for the benefit of any other person than the party in whose name the insurance is effected, nor do their terms necessarily imply such a purpose. In this respect they differ from all the other forms in use. Property held "on commission" is almost invariably subject to a lien in favor of the holder, for charges or advances, or both. This gives him an insurable interest, which, of itself, might be deemed to satisfy the terms of the policy. As much or more, to the same purpose, might be said in reference to the terms "in trust." Hence arose a doubt whether these policies could be construed as applicable to the interest of a consignor. Judge OAKLEY, in De Forest v. The Fulton Fire Ins. Co. (1 Hall, 135), furnishes an apt solution of the doubt by suggesting that these words *Page 91 
are equivalent to the clause "for whom it may concern." The decision in that case may be thought to partake of a liberality more conspicuous in modern times than formerly. It certainly gives an effect to the policy beyond the precise letter, and beyond what might seem its mere import. But there had grown up a general practice of using this form to cover all interests in the specified articles which the commission merchant desired to cover. It may have been right to give it a judicial sanction, and, at any rate, the point is now at rest. But it never has been held by any court or law writer that, per se, these words absolutely, and to the exclusion of all explanatory extrinsic proof, cover the interest of all persons holding the relation of consignors to articles in the designated place, of the description specified, and held on commission by the person taking out the policy. The defendants' claim rests on the hypothesis that such is their legal effect, and that extrinsic evidence is not admissible to show that the consignee who obtains such a policy was not bound to procure insurance for a particular consignor, and did not intend to cover such consignor's interest.
In this case the consignees lost no property of their own; they held on commission $30,000 worth of property which they had engaged to insure, and about $10,000 worth which they were not bound to insure. If the consignees had been insolvent and refused to enforce the policies, the consignors would have been obliged to sue the insurers. They must all have been parties to the action, either as plaintiffs or defendants. If they were very numerous, one might bring the action as well for himself as for all others in interest; but this would only have been a variance in form. In such cases, before a final disposition can be made, every party in interest must be brought in before a master or referee, or by his default after notice be forever precluded from any claim on the fund. The rules concerning parties would require this in order to protect the insurers from many accountings and repeated actions. If it could be thought that each consignor could bring a separate action, the insurers could still accomplish the same result by a cross action *Page 92 
of interpleader. The moment the liability of the insurers in such an action to the extent of $30,000 was determined, their interest in the controversy would cease, and a question as to the distribution would arise between the other parties, i.e. the consignees. The insurers, having no concern in it, could take no part in this controversy. How, let us inquire, would the fund be distributed?
The defendants claim to be paid in full; and they recovered before the referee on that basis. They certainly could not recover to that extent in a controversy between them and the other consignors. Nor do I conceive that in such a controversy the defendants, or Morgan Co., could recover any portion of the fund. Evidently the other class of consignors would be entitled to the whole. Perhaps it might be suggested that the defendants would be content to share pro rata. The unreasonableness and injustice of such a claim might be made more striking, though not more clear, by altering the figures so as to present a supposed parallel to this case. Let it be supposed that the stock destroyed by the fire was worth $100,000; that nine parts of it belonged to the defendants and Morgan Co., and one part to the other class of consignors for whom the plaintiffs were bound to insure, and that insurance had been effected only to $10,000. Even in the mitigated form last suggested, the defendants' claim, if sustainable, would cut down to a ten per cent dividend the consignors who, upon every principle of justice and fair dealing, were entitled to full indemnity.
A method of applying the principles of law which necessarily leads to such results, cannot be correct; and it only remains to show precisely wherein the defendants' error consists.
In the first place, the policy does not describe the interest
insured; nor is it necessarily to be understood as including absolutely all interests in all lumber held by the plaintiffs upon any sort of trust, or under any possible form of commission. For instance, the consignors interested in lumber which has been consigned with a positive prohibition against effecting any such insurance, would not be included. (6 *Page 93 
Duer, 70.) And if extrinsic evidence can be given to exclude from the insurance any class of consignors, the alleged rule fails. It is only by force of a very liberal implication in favor of an intent not expressed in the policy, that the interest of any consignor is let in and protected. And it would be strange indeed if that concession could be so intensified as to force upon the general words of the policy an inclusion of all consignors who, after the disaster, might choose to come in and strip of their indemnity the consignors who bargained for it in advance, and paid the premium accordingly. But, in the next place, the referee admits that if extrinsic evidence be admissible, the defendants must fail; and by the authorities it clearly appears that in all these cases of general insurance intended to cover the interest of principals not named, extrinsic evidence that the claimant was within the intent, is not only admissible, but actually indispensable, to a recovery against the insurers, though, like other facts, it does not require direct proof, but may be inferred from circumstances. Catlett v. The Pacific Ins. Co. (1 Wend. 575) is a direct authority for the admission of such evidence, even in an action against the insurers on the policy. In that case an insurance was effected by an agent "on account ofthe owners." There were in fact three owners. Two of them sued upon the policy, and the non-joinder of the third was set up as a defense. Precisely as Judge OAKLEY held in reference to the clause now in question (1 Hall, 135), the Supreme Court held that the phrase "for account of the owners," was equivalent to saying "for whom it may concern;" and accordingly parol extrinsic evidence was received to show the intent of those who instructed the agent to obtain the policy. On error, Chancellor WALWORTH approved this decision, and the judgment was affirmed. (S.C., 4 Wend. 89, point 1.) "The owners," by force of the definite article, meant, prima facie, all the owners; yet that did not avail to exclude the evidence of intent. Here the policies did not refer to "the consignors," as intended to be insured, and they can only embrace the interest of any consignor by a free construction as to a presumed intent; yet if *Page 94 
they had so referred to "the consignors," Catlett v. ThePacific Ins. Co. would authorize the admission of extrinsic evidence that, as to some consignors, it was not intended to include their interest. The case is a conclusive authority on this point.
If the printed clause above recited from the policies in question be deemed to obviate the ambiguity of the written words, and so make them read as insurances "on account of Lee Hall and their consignors," that circumstance would only render more precise and perfect the parallel between the question under consideration and the decision in Catlett v. The PacificInsurance Co. That case would then stand as authority in point for the admission of extrinsic evidence that some consignors were not covered.
I consider it quite clear, therefore, that, even in an action on the policies against the insurers, parol extrinsic evidence would be admissible to show that the plaintiffs were not bound to insure, or instructed to insure, and did not intend to insure, the defendants' interest; and I conceive that such evidence would exempt the insurers from any claim on that account. But it is entirely unnecessary to decide either of these questions. The insurers had no interest in either; they were bound at any rate to the whole extent of their policies. There is another view of the case which is more in point, and is decisive.
IV. This is not an action against the insurers, or upon the policies. The rule that parol extrinsic evidence shall not be received to contradict or vary a contract which is in writing, applies only in controversies between the parties, promisor and promisee, in such contract. It is founded upon the just and rational presumption that the parties have made all the stipulations for the protection of their respective interests, on which they were agreed, and have, in language chosen by themselves, placed such stipulations in a more certain form than mere oral discourse, for the purpose of excluding all such loose and uncertain media of proof. The writing is not conclusive as between one of the contracting parties and a third person. This doctrine is asserted, in general terms, *Page 95 
in a multitude of authorities; but, in many instances, it is accompanied by remarks from which it might be contended that the privilege of explaining the written document was not accorded to him who was a party to it, but only to his adversary. (1 Greenl. Ev. § 279; New Berlin v. Norwich, 10 Johns. 230; Evans v.Wells, 22 Wend. 345.) But it is not so confined. According to Coke's Lit. 352, a, "every estoppel ought to be reciprocal — that is, to bind both parties; and this is the reason that regularly a stranger shall neither take advantage of nor be bound by the estoppel." To this effect see Gaunt v. Wainman (3 Bing. N.C. 69); Jewell v. Harrington (19 Wend. 472);Sparrow v. Kingman (1 Comst. 246, 253); Cattle v. Snyder
(10 Mo. 769).
In Reynolds v. Magness (1 Ired. 30, 31), after stating the general rule, and that it applies only as between the parties and not to strangers, Judge GASTON says: "They [the strangers] are at liberty to show that the written instrument does not disclose the full or true character of the transaction. And if they be thus at liberty, when contending with a party to the transaction, he
must be equally free when contending with them. Both must be bound by this conventional law or neither. * * Estoppels must be mutual."
In Walton v. Crouly (14 Wend. 67), the right of a party to a deed to explain it as against a third person was maintained, though such third person was a privy in estate. Besides, although written contracts may not be varied by extrinsic parol evidence in an ordinary action between the parties, yet, when, as sometimes happens, there is a mistake in the writing, a party affected thereby is not remediless. By an action in equity he may have the writing reformed and made to express the actual intent. In such an action it is not necessary or allowable or possible to make all the world parties; those between whom the contract was made are alone heard. And, of course, if they happen to be both honest and intelligent, no suit for reformation can ever be requisite. This may suffice to illustrate the position now assumed.
Neither are the terms of a written contract conclusive as to the shares or proportions in which a set of parties on one *Page 96 
side of the contract are interested in its fruits as between themselves. Such questions do not usually enter into the consideration of those who settle the forms of written contracts. Each party, in framing the contract, considers only what by its terms he may exact from the other, and what the latter may thereby exact from him. The parties of the first part in a contract may have no joint or mutual interest in the subject-matter; one may be merely the agent, clerk or servant of the other; yet the paper would warrant, prima facie, the supposal of an equal interest. In an action on the contract against the other party, no question of this sort can arise. But, surely, in a controversy between the parties of the first part, the paper is not conclusive and irrefragable evidence of a mutual and equal interest in the benefits of the contract. If all the consignors had been expressly named as insured parties, the last mentioned proposition would have full play in a controversy between them concerning the distribution of the insurance money. I have already shown that, as between them, the question would be entirely open.
V. In his ninth lecture, section twenty-six (2 Duer on Insurance, pp. 38, 39), Mr. Duer takes up a position which he imputes to Mr. Phillips, and condemns it. It is, that one seeking to recover on a policy taken in his own name, applicable by its terms to his own interest, and on which he claims, cannot recover if, in fact, through some mistake or misapprehension, he had in his mind at the time he effected the insurance, and intended thereby to cover some other and different interest. He discussesthis defense by an insurer at great length, onward to the end of section 29, page 48. He pronounces it novel, unreasonable, unconscientious and dishonest. He concludes by asserting that, as in such a case the policy is applicable, in terms, to the subject claimed upon, the insurer cannot be permitted to contradict it by parol extrinsic evidence of an intention on the part of the insured not to cover that subject.
Mr. Phillips, in a subsequent edition of his work, puts this very peculiar point as a quere, and suggests that "the jurisprudence on this subject is contradictory." (Phillips on *Page 97 
Insurance [3d ed.], §§ 393, 394.) These positions of Phillips and Duer are relied upon by the referee as justifying the exclusion of extrinsic evidence in the present case. Stating the point which they thus present must suffice to show that they have no relevancy whatever to the case in hand.
The precise nature of that point may be illustrated by a reference to facts in this case.
The policies, in the most express terms, covered Lee Hall's interest in all the defendants' lumber, that is to say, their lien for advances, etc. Let it be supposed that Lee Hall had brought an action against the insurers on the policies, with a view of recovering, for their own benefit, the amount of that lien, and that the insurers, for the purpose of defeating the recovery, had offered to show that Lee Hall, when obtaining the policies, did not intend to cover that interest. Such, we may see, was the fact; and, if the evidence was admissible, and allowed to have any effect, it would exonerate the insurers. Mr. Duer says that such a defense is inadmissible, because it would be an offer to prove that the intent of parties to a written contract was precisely the reverse of that which the written contract, made by and between them, explicitly affirms. Mr. Phillips thinks "the jurisprudence on this subject is contradictory." It is enough for us to say that the point is not presented by the controversy between the litigants in this case.
Turner v. Burrows (5 Wend. 546), and the same case in error (8 Wend. 152), are relied upon as showing that parol extrinsic evidence of the intent of the party effecting the insurance is inadmissible in an action between him and a third person claiming to participate in the insurance money. The judgment of the Superior Court was not reversed on the ground that there was error in receiving such evidence. The same controversy was again before the Supreme Court, and the final decision is reported in 24 Wend. 276. Parol extrinsic evidence of the intent was again received. The court held that it was properly received, and that nothing to the contrary could be inferred from the previous decision. These cases are, therefore, authorities in favor of the *Page 98 
plaintiffs here. Cases in which a consignor was allowed to participate in the insurance money received by a consignee who had claimed the full valve of the res from the insurers under a policy in terms applicable to the consignor's interest, have no relevancy to the present; neither do I perceive that the decision or the opinion in Stilwell v. Staples (19 N.Y. 407), contains any thing that conflicts with the views now expressed.
VI. If the plaintiffs were insured on their own interest in the defendants' lumber by virtue of their lien for advances and charges, they did not claim or receive any thing from the insurers on that account; nor was this particular point made a ground of defense on the trial. The plaintiffs tendered evidence that the defendants were perfectly responsible, and that the policies were not intended to cover even this interest. As between the parties to this action, I think this evidence was admissible. But, whether this be so or not, the defendants having waived the point at the trial, and again by this appeal, it cannot now be available. The advances and charges were debts due from the defendants to the plaintiffs.
The lien was only a security therefor. The insurer of a creditor's lien is entitled, on paying the loss, to be subrogated to the demand of the creditor. Consequently, the defendants lost nothing by the plaintiffs' omission to claim from the insurers their charges and advances on the lumber in question. Of course, a different rule applies where the debtors pay or allow themselves to be charged with the premium paid by their creditors on an insurance made by the creditors to cover their own specific property as lien holders. (Phillips on Ins. [3d ed.] § 397.) Further answers to any claim of this sort might be stated, but these should suffice.
The order appealed from should be affirmed. Judgment absolute should be rendered against the defendants for $1,156.37, and interest thereon from January 1, 1857, with costs of the action below, and also with costs of the appeal.
All the judges concurring, except BOCKES, J., not voting,
Judgment affirmed. *Page 99